Nottingham v. Amwell.

---

## NOTTINGHAM v. AMWELL.

1. The settlement of a bastard child is at the place of the legal settlement of its mother at the time of its birth. This is the construction of the words in the statute, " the place of the last legal settlement of the mother."
2. The settlement of a bastard does not change by a subsequent change in that of the mother.
3. The value of the estate required to obtain a settlement by a year's residence thereon must be estimated independent of incumbrances.

On *Certiorari* in Mercer Sessions, argued January Term, 1847, before CARPENTER, J. sitting alone in the Branch Court.

This *Certiorari* brought up the order of the Court below on appeal, reversing an order of two justices to remove William Lloyd, a pauper, from the township of Nottingham in the county of Mercer, to the township of Amwell in the county of Hunterdon.

The pauper is an illegitimate son of Sophia Musgrove, born in what is now the township of Hamilton in the county of Mercer, before her marriage with Allen Lloyd. The mother was born in Nottingham, and her first husband Allen Lloyd, never having acquired any settlement of his own, she acquired no other settlement until her marriage with Pidcock.

About 1825, and after the death of her first husband, the mother of the pauper married one Pidcock. The pauper made his home with his mother after this marriage. Pidcock was born in Amwell and there settled previous to his purchase of certain property and.residence in Trenton, (now Ewing.)

In April 1813, Pidcock purchased of one Burroughs and wife an undivided moiety of certain ferry property, situate in Trenton, (now Ewing,) which, independent of all incumbrances was of the value of more than fifty pounds, for which he paid $800, (*pro ut deed*). He entered and dwelt thereon until about 1829. But the property was subject to an equitable mortgage, a suit to enforce which was pending at the time it was so purchased by Pidcock. A decree having been obtained, in 1819 or 1820, the whole of said property was sold by virtue of an execution issued thereon for a sum which did not discharge the incumbrance; and the purchaser under such sale entered and took possession. Pidcock died in 1819 without gaining any further or other settlement than here specified. His wife Sophia, who survived him, gained no other or further settlement than here specified.

*Vroom* for Nottingham. Two questions are raised, whether the settlement of this child is where born, or whether its settlement followed that acquired by marriage? Secondly, if it followed the derivative settlement of the mother on her marriage with Pidcock, where was his settlement, in Amwell or Ewing?

1. At common law the settlement of a bastard child is at the place of its birth; but under our statute, (*Rev. L.* 36, § 4,) it is the *last* legal settlement of the mother. The words "last legal settlement of the mother," do not refer to the period of its birth merely, but the settlement of the child will follow that of the mother in its subsequent mutations. So settled in New York, upon the words of this statute, in this respect the same as ours. *Canajoharie* v. *Johnstown*, 17 *John. R.* 41. The act attaches the child to the parent and avoids the necessity of separation. This construction is invited by terms of the statute and the words "*last* legal settlement" imply that the primary settlement of the mother at the time of the birth was not intended.

2. As to the settlement of Pidcock. We say that it was in Amwell to which the pauper was removed, and not as asserted on the other side in Ewing. This question depends upon what property will give a settlement, which must be seisin of freehold estate of the value of fifty pounds, and living upon said estate for one full year, (*R. L.* 35 § 1.) Pidcock purchased real estate situate in Trenton, (now Ewing), in the county of Hunterdon, (now Mercer), on which he resided more than 1 year, but subject to an equitable mortgage. He purchased pending suit, and when sold it did not pay the incumbrance. He had not an estate of the value of £50. *Groton* v. *Boxborough*, 6 *Mass.* 50; *Conway* v. *Deerfield*, 11 *Ib.* 327; *Rex* v. *Mattingley*, 2 *T. R.* 12; *R.* v. *Chailey*, 6 *Ib.* 755. The case in *Pen.* 1039, should not govern this case.

*Wakefield* and *Wurts* for Amwell, contra. The settlement of the mother at the time of the birth was in Nottingham, and the statute there fixes the settlement of the child. The object of the 4th section, as obvious from the preamble, was to prevent fraudulent removal before birth. It can require no subsequent derivative settlement and such is the construction which has always prevailed in New Jersey. The township upon which the burthen of a bastard child might be thrown by a derivative settlement, would be without any remedy against the putative father. In New York, their statute is without preamble. Can it be that the settlement of the bastard is to change, and an order of removal to

be made at each successive settlement of the mother? In New York, as also in Massachusetts, where under former statutes, the settlement of the bastard followed that of the mother, the matter has been corrected. 12 *Mass.* 429; 14 *Ib.* 382; 13 *Pick.* 303.

The analogy of English decisions is against such derivative settlement. In the case of legitimate children, their settlement depends upon that of the father, if he have any, and does not follow the derivative settlement of their mother upon a second marriage; although they may continue with her for nurture. 3 *Salk.* 259; *Burr. Sett. Cas.* 2; 16 *Mass.* 52; 7 *Pick.* 140; 5 *Q. B.* 210; *Ewing's N. J. Justice,* 366, 367.

2.. But if the settlement does follow that of the mother, she gained a subsequent settlement in Ewing, by virtue of her husband's settlement through purchase. He paid $800 for the property and the court will not look into liens. *Newark* v. *Pompton,* 2 *Pen.* 1039. Are two justices in order to ascertain a settlement, to investigate mortgages, judgments and decrees?

CARPENTER, J. If the counsel for the township of Nottingham fail in either of the positions taken by him, the order of the Sessions must be affirmed.

Whether the settlement of a bastard child remains at the place of settlement of the mother at the time of its birth, or whether its settlement follows that of the mother subsequently acquired, depends upon the construction of our statute. At common law, the place of the settlement of a bastard child was generally at the place of its birth. An accidental delivery elsewhere might therefore change the place of settlement, or rather give it a different place of settlement from that of the mother. This frequently led to the fraudulent removal of women about to give birth to such children to other places, in order to cast the burthen of maintenance upon some township or precinct not properly chargeable. After reciting this mischief, the fourth section of our statute of 1774, then enacts that "*therefore* all bastard children shall hereafter be deemed settled in the place of the last legal settlement of the mother," &c. (*Rev. L.* 36; *Rev. Stat.* 878, § 4.) The object of the statute was to prevent the fraudulent removal of the mother before birth of any bastard child. The remedy provided was fixing a settlement for such child at the time of its birth—*then* fixing that settlement at the place of the last

legal settlement of the mother. It seems to me that the words
*last* legal settlement, refer to the settlement of the mother at the
time of the birth, and not at the time of the order. But aided by
the preamble, I think there can be no doubt as to the true con-
struction. I am unable to follow the case in New York. In my
judgment, therefore, the settlement of the pauper at Nottingham
was not changed by the subsequent change in that of his mother
on her marriage with Pidcock.

The second question raised in this case is, whether Pidcock,
by his purchase and residence in Trenton, (now Ewing,) changed
his settlement from Amwell to that township. By the terms of
the statute, " every person who shall become seised of any free-
hold estate of the value of fifty pounds, in any township, &c.
and shall dwell upon said estate in the township, &c. in which
such estate doth lie, for one full year, shall thereby obtain a legal
settlement in such township &c." (*Rev. L.* 35 § 1.) The pur-
chase was made by Pidcock subject to an equitable mortgage
and pending suit, and therefore he was chargeable with notice.
There is no difficulty as to the *seisin;* the owner of the equity
of redemption, except as regards the mortgagee being consid-
ered the owner of the land. The purchase, so far as appears,
was made in good faith, and the consideration paid as expressed
in the deed was eight hundred dollars. When sold under the
decree of the Court of Chancery, the proceeds of the sale are
very far below the amount of the incumbrance. The only ques-
tion is as to the value of the estate. I think that for the pres-
ent purpose the consideration expressed may be taken as prima
facie evidence of the value, though undoubtedly not conclusive.
I do not think that the mere fact of a sale by the Sheriff, for a
less sum, although far less than the incumbrance, is conclusive, so
as necessarily to overcome the prior presumption. The number-
less circumstances that may, and often do affect such sales, make
it a very unsatisfactory test. But the question of fact as to the
value of the estate, was before the Sessions on the hearing of the
appeal, and from the facts stated, supposing the case to turn on
this point, I am not prepared to say that they erred.

But it has been held in this State, that although a purchaser
of land of the value of more than £50, immediately mortgaged

it for the whole price, and never actually paid any of the pur-
chase money, yet in the absence of fraud, under this statute he
must be considered as seised of a freehold estate of the value
of £50.   *Newark* v. *Pompton,* 2 *Pen.* 1038.   This case would
seem to rule the present.   The court, then, correctly disregarded
the incumbrance in estimating the value of the estate.   Much
inconvenience in the investigation of liens before two justices, is
avoided by this construction, and I am not prepared to overrule
it.   The cases cited do not meet the case.   *Rex* v. *Mattingley,*
2 *T. R.* 12, was decided upon a statute which required the pur-
chase of an estate, whereof the consideration *bona fide paid*
should amount to the sum of £30.   A purchase for £39, subject
to a mortgage of £32, but £7 only being actually paid, was held
not to meet the provisions of the statute.   The cases cited from
Massachusetts, were ruled on the peculiar phraseology of their
statute—" the *clear* yearly value"—viz: the value over and
above incumbrances.

I am of the opinion that the order of the Sessions must be
affirmed.