CITY OF PHILADELPHIA, PLAINTIFF, v. LUCY I. AUSTIN, DEFENDANT.

District Court Burlington County

October 5, 1979.

*Mr. Charles Crabbe Thomas* for plaintiff.

*Mr. William S. Ruggierio* for defendant (*Messrs. Ruggierio & Freeman* attorneys).

WELLS, J. S. C.

This is a suit on a Pennsylvania judgment and represents another effort of Philadelphia to enforce its wage tax. *Phila-*

*delphia v. Stadler*, 164 *N.J.Super.* 281 (Cty.Ct.1978). As in *Stadler*, defendant herein, a New Jersey resident, worked within a Federal enclave, the Frankford Arsenal, for the years 1967– 1974. Mrs. Austin did not file returns, pay, nor was there withheld from her salary, the Philadelphia wage tax.

Pursuant to § 19–508 of the Philadelphia Code, which creates an offense for failure to file returns, the city instituted a complaint in its municipal court for collection of $900 in penalties ($300 a year for the years 1972–1974), the limit of its jurisdiction.

While it is not at all clear who, if anyone, appeared on November 9, 1976, there does appear an entry in the municipal court record of that date signed by a judge, imposing a fine of $300 and $11 costs.

Mrs. Austin appealed on November 23, 1976 to the Court of Common Pleas, giving her address as 5920 Trinity Street, Philadelphia, Pennsylvania. Simultaneous with her appeal, a rule upon the city to file a complaint within 20 days or suffer a judgment of *non pros* was entered, and her notice of appeal and rule to file complaint and a surety bond guaranteeing the payment of costs were served on the city.

Within the time allowed, the city did file a complaint in *assumpsit* in the Court of Common Pleas alleging the legal basis of its claim for the tax, the amount of tax due, $1,354.61, and defendant's failure to pay, and concluded with paragraph 9 and a prayer for relief:

> The plaintiff claims a fine of Three Hundred Dollars ($300.00) in accordance with the provisions of Section 19–508 of the Philadelphia Code for each of eight (8) following violations of the Code: failure to file returns and/or to pay Earnings Tax, or the balance of tax, together with interest and penalties thereon for the years 1967 through 1974 for the total sum of Two Thousand, Four Hundred Dollars ($2,400.00).
>
> WHEREFORE, the Plaintiff demands judgment against the Defendant for the sum of $2,400.00.

According to the return of service, the complaint was served at 5920 Trinity Street, Philadelphia, by handing it to "adult female," "an adult person in charge of defendant's residence, the said adult person having refused, upon request, to give her name and relationship to said defendant."

Mrs. Austin did not file an answer or appear, and on May 2, 1977 a default judgment was entered against her in the Pennsylvania Court of Common Pleas for $2,400 by the filing of affidavits of proof and nonmilitary service.

The matter is before the court on a motion for summary judgment based on the Pennsylvania Common Pleas judgment, supported by briefs and the record of the Philadelphia court proceedings. No material issue of fact is raised in any answering affidavits. Plaintiff claims the judgment is entitled to full faith and credit, while defendant contends the judgment is based upon a penal law and is therefore outside of the reach of that constitutional provision.

Before deciding what effect is to be given to the Pennsylvania judgment, it is first essential to determine the true nature of the statute upon which it is based.[1] The standard governing such an inquiry was set forth in *Huntington v. Attrill*, 146 *U.S.* 657, 683, 13 *S.Ct.* 224, 36 *L.Ed.* 1123 (1897), and is binding upon this court in a proceeding in which the Full Faith and Credit Clause, *U.S.Const.*, Art. IV, § I, is invoked. 36 *Am.Jur.2d, Forfeitures and Penalties*, § 12; 4 *A.L.R.* 970 (1919).

The words "penal" and "penalty" are chameleon-like, having different shades of meaning in the various factual contexts in which they appear. *Wilentz v. Hendrickson*, 133 *N.J.Eq.* 447 (Ch. 1943), aff'd 135 *N.J.Eq.* 244 (E. & A.1944); 36 *Am.Jur.2d*,

---

[1] Section 19–508 of the Philadelphia Code provides, in pertinent part: "Any person who shall fail or refuse to file a return . . . shall be subject to a fine of not more than Three Hundred ($300.00) Dollars for each offense, with imprisonment for not more than ninety (90) days if the fines and costs are not paid within 10 days."

*Forfeitures and Penalties,* § 2. Though avoiding exact definition, the terms are generic in nature and are generally deemed to encompass fines. A fine is a sum of money exacted of a person guilty of a crime or contempt as a pecuniary penalty. 36 *Am.Jur.2d, Forfeitures and Penalties,* § 4. For purposes here it is appropriate to treat a penalty as including a fine. Compare *Sawran v. Lennon,* 19 *N.J.* 606 (1955).

*Huntington v. Attrill, supra* describes the relevant concept as *"penal law in the international sense."* Thus we ask: What is a penal law in the international sense and is § 19–508 such a law? *Huntington's* classic exegesis is:

> The question whether a statute of one state, which in some aspects may be called penal, is a penal law in the international sense, . . . depends upon the question whether its purpose is to punish an offense against the public justice of the state, or to afford a private remedy to a person injured by the wrongful act. [146 *U.S.* at 673–674, 13 *S.Ct.* at 230].

This definition corresponds closely to that found in the *Restatement, Conflict of Laws,* § 611, comment (a) (1934), which defines a penalty as "a sum of money exacted as punishment for a civil wrong as distinguished from a compensation for the loss suffered by the injured party."

In this instance the party plaintiff is a public entity, a municipality of the Commonwealth of Pennsylvania, seeking recovery on a judgment based upon a statute imposing a $300 fine for each year a taxpayer fails to file a wage tax return. The suit did not seek collection of the wage tax itself nor the delinquent filing fee, a nominal "penalty" found by this court in *Philadelphia v. Stadler, supra,* to be properly included as part of a Pennsylvania judgment for taxes, enforcement of which is sought in New Jersey. See also *Philadelphia v. Smith,* 169 *N.J.Super.* 156 (App.Div.1979)

But the statutory goal of § 19–508 is clearly not compensatory or restitutory, but rather "vindication of the public justice." *Loucks v. Standard Oil Co. of New York,* 224 *N.Y.* 99, 103, 120

*N.E.* 198, 199 (1918). As such it is a penal law in the international sense, meant to inflict a pecuniary punishment for ignoring a public responsibility. See *Nelson v. Minnesota Income Tax Div.*, 429 P.2d 324 (Wyo.Sup.Ct.1967), discussed in *Buckley v. Huston*, 60 *N.J.* 472 (1972); *Philadelphia v. Smith, supra.*

Having found § 19–508 to be a penal law it is necessary to determine the interplay between the Full Faith and Credit Clause of the United States Constitution and the oft-cited rule that a state need not enforce the penal law of a sister state. The United States Supreme Court repeatedly says that a judgment based upon a penal law may be denied full faith and credit, but has never in the case of a suit in one state, or a money judgment entered in another, squarely utilized the rule as the basis of a holding. Nor has it been used by any appellate court in the State of New Jersey. But see *Philadelphia v. Smith, supra; State ex rel. Acorman v. Pitner*, 80 *N.J.Super.* 91 (App.Div.1963), rev'd 42 *N.J.* 251 (1964).[2]

The doctrine—if it can be so called—had its genesis in *The Antelope*, 23 *U.S.* 66, 123 (10 *Wheat.* 66) 6 *L.Ed.* 543 (1825),

---

[2]In *Philadelphia v. Smith, supra*, the Appellate Division ruled that a foreign tax judgment which included a "penalty" for delinquent payment of the Philadelphia wage tax is entitled to full faith and credit when the penalty is sought as a portion of an overall tax liability. It is difficult for this reader to discern whether or not the court found the "penalty" to be a charge arising under a penal law in the international sense of *Huntington v. Attrill, supra*. The court's repeated references to the compensatory nature of the tax "penalty" and to its purpose in the statutory plan—"to motivate timely payment," *Id.* at 164—would suggest that the court felt it was a nonpenal claim despite statutory characterization. See *Huntington v. Attrill, supra; Philadelphia v. Stadler, supra*. Further, the court's juxtaposition of the "penalty" there involved and the "fine" here at issue would support such a conclusion. Regardless, the court's *dictum* respecting the unenforceability of the $300 a year sanction for failure to file a return is not binding upon this court. *Bierne v. Gangemi*, 74 *N.J.Super.* 557 (App.Div.1962), and thus leaves open the issue for determination here.

where Chief Justice Marshall, without aid of citation, stated that "the courts of no country execute the penal laws of another.[3]

This language resurfaced in *Wisconsin v. Pelican Ins. Co.*, 127 *U.S.* 265, 32 *L.Ed.* 239 (1888) where the Supreme Court held that Wisconsin could not invoke the original jurisdiction of that court to enforce a penalty against a nonresident insurance company which had failed to comply with certain business reporting statutes. In reaching this result the court discussed the rule that countries will refuse extraterritorial effect to penal laws. It reasoned that since penal laws are offenses against the sovereign and "no society takes concern but what is hurtful to itself," *Id.* at 291, a penal law's force is limited to and coextensive with the boundaries of the territory in which enacted. Thus, an original suit upon such a penal claim could not be maintained in a foreign jurisdiction.

The same result was found crucial to the doctrine when the cause of action had been reduced to judgment, the court stating: ". . . if this were not so, all that would be necessary to give ubiquitous effect to a penal law would be to put the claim for a penalty into the shape of a judgment." *Id.* at 290. Nor was the rule found to be altered by the Full Faith and Credit Clause:

> The application of the rule to the courts of the several states and of the United States is not affected by the provisions of the constitution and of the act of Congress, by which the judgments of the courts of any state are to have such

---

[3]One commentator researching case authority available to support the declaration found two cases. *Folliott v. Ogden*, 1 *H.Bl.* 123 (1798), aff'd *Ogden v. Folliott*, 3 *T.R.* 720 (1790); 4 *Bro.P.C.* III (1792), and *Wolff v. Oxholdm*, 6 *M.&S.* 99 (1817), which might have been cited. Both cases involved England's refusal to give effect to statutes of foreign nations engaged in war with England. The researcher observed that the English courts could "have spoken of local public policy, and have reached the same result as surely." Leflar, "Extrastate Enforcement of Penal and Governmental Claims," 46 *Harv.L.Rev.* 193, 195 (1932).

faith and credit given to them in every court within the United States as they have by law or usage in the state in which they were rendered. [at 291]

Once again, in *Huntington v. Attrill*, 146 *U.S.* 657, 13 *S.Ct.* 224, 36 *L.Ed.* 1123 (1892), the Supreme Court assumed that an enforcing state could refuse to respect a foreign penal judgment, but did not so hold, ruling instead that the statute upon which the judgment was based was not a penal law. Focusing on the relation of the Full Faith and Credit Clause and the rule at issue here, the court stated:

[The provisions of the constitution and the implementing legislation] confer no new jurisdiction on the courts of any state, and therefore do not authorize them to take jurisdiction of a suit or prosecution of such a penal nature that cannot, on settled rules of public and international law, be entertained by the judiciary of any other state than that in which the penalty was incurred. [at 685, 13 *S.Ct.* at 234]

See also, *Andrews v. Andrews*, 188 *U.S.* 14, 23 *S.Ct.* 237, 47 *L.Ed.* 366 (1903).

But in the 20th Century a series of Supreme Court cases have shed considerable doubt on the current viability of the penal law doctrine. In *Magnolia Petroleum Co. v. Hunt*, 320 *U.S.* 430, 64 *S.Ct.* 208, 88 *L.Ed.* 149 (1943), the court had occasion to examine the workings of the Full Faith and Credit Clause. While conceding "that the command of the Constitution and the statute is not all-embracing," *Id.* at 438, 64 *S.Ct.* at 213, it stated:

We are aware of no . . . exception in the case of a money judgment rendered in a civil suit. Nor are we aware of any considerations of local policy or law which could rightly be deemed to impair the force and effect which the full faith and credit clause and the Act of Congress require to be given to such a judgment outside the state of its rendition. [at 438, 64 *S.Ct.* at 213]

Likewise, full faith and credit was read as requiring enforcement of a foreign judgment for taxes in *Milwaukee Cty. v. M. E.*

*White Co.*, 296 *U.S.* 268, 56 *S.Ct.* 229, 80 *L.Ed.* 220 (1935). Although the court expressly refrained from voicing its view as to the continued vitality of the concept examined in *Wisconsin v. Pelican Ins. Co., supra*, it ruled:

> A cause of action on judgment is different from that upon which the judgment was entered. In a suit upon a money judgment for a civil cause of action, the validity of the claim upon which it was founded is not open to inquiry, whatever its genesis. Regardless of the nature of the right which gave rise to it, the judgment is an obligation to pay money in the nature of a debt upon a specialty. [127 *U.S.* at 275, 32 *L.Ed.* 239]

Four limited exceptions were found to escape the dictates of Article IV, § 1: (1) the rendering court is without jurisdiction; (2) the debt has ceased or been discharged; (3) the state of the forum court has not provided a forum for the cause of action, or (4) the debt was procured by fraud. Omission of the penal law theory has been read as having tolled the death knell for the doctrine. Comment, "Extrastate Enforcement of Penal Laws," 25 *U.Chi.L.Rev.* 187 (1957). Moreover, the court discredited *Wisconsin v.Pelican Ins. Co., supra*, by saying:

> So far as [*Wisconsin v. Pelican Ins. Co.*] can be taken to suggest full faith and credit is not required with respect to a judgment unless the original cause of action would have been entitled to like credit, it is inconsistent with decisions of this court already noted, and was discredited in *Fountleroy v. Lum, supra*, 210 *U.S.* 230, 236, 237, 28 *S.Ct.* 641, 52 *L.Ed.* 1039, and *Kenney v. Supreme Lodge, supra*, 252 *U.S.* 411, 414, 415, 40 *S.Ct.* 371, 64 *L.Ed.* 638, 10 *A.L.R.* 716. [127 *U.S.* at 279, 32 *L.Ed.* 239]

Tersely stated, this court perceives latter-day uncertainty whether full faith and credit does not, in fact, require enforcement of a foreign judgment even though based on a penal law. *Restatement, Conflict of Laws*, 2d, § 120, comment (d) (1973); 36 *Am.Jur.2d, Forfeitures and Penalties*, 576; 4 *A.L.R.* 971,

supplemented 10 *A.L.R.* 719, supplemented again 24 *A.L.R.* 1437; 44 *A.L.R.*3d 960 (1972).

As one commentator has noted: "One trouble about a rule of law which everyone takes for granted is that no judge ever bothers to state the reasons for it." *Leflar, supra* at 196.

To avoid this downfall the court asks what reasons do exist which are said to obligate a state to deny effect to a sister state's money judgment based upon a penal law? Again, *Leflar* is enlightening:

> A variety of reasons might be presented as justifying refusal to enforce in one state obligations, either civil or criminal in nature, which have arisen under the laws of another state. . . . They may be very briefly summarized as (1) historical reasons based on the intensely local character of early legal systems, including the fact of collective responsibility of the community for acts done within its borders and the notion of the trial body as a jury of neighbors personally acquainted with the facts in the case; (2) respect for the sovereign rights and pretensions of foreign states and nations, doubled with the idea that the diplomatic process of extradition and interstate rendition would give adequate relief against absconding parties; (3) procedural difficulties, such as the nonavailability at the forum of a remedy by which reasonably equivalent relief could be assured, and the traditional procedure in criminal cases of action brought by the injured state as a plaintiff; (4) local public policy opposing the type of claim presented for enforcement; (5) very real practical inconveniences, particularly (a) the added expense to taxpayers of conducting trials and enforcing sentences and judgments, coupled with possible overcrowding of dockets by unnecessarily imported suits, (b) expense and hardship to the defendant from having to appear with witnesses at a distance from the place where the events in question occurred, (c) possibly increased difficulty of reliable proof of facts at a distance from the place of their occurrence, and (d) possible ignorance and difficulty of proof of foreign law as such; (6) American constitutional guaranties to criminal defendants of the right to trial by jury in the vicinity of the offense. [*Leflar, supra* at 201–202]

In the situation at hand neither the logic nor the policy of the above reasons compels the court to deny full faith and credit to this Pennsylvania judgment. Now, far from local jealousies the nation has grown into an intensely interdependent whole in which no state should or would want to become a haven for the

scofflaws of another. Dominating the artificial boundaries between states now is the ebb and flow of thousands who cross such boundaries daily, deriving economic and social benefits nurtured by the political and taxing entities guarding and providing for welfare of resident and non-resident alike.

No issue of substantive or procedural due process is raised here in defense of Mrs. Austin. In fact, it was her own appeal in Pennsylvania which ultimately resulted in the judgment. Nor is there any evidence of practical difficulties or added expense incident to defending in Philadelphia. In summary, the stated reasons, whatever validity they may yet have in the criminal law, see *Nelson v. George*, 399 *U.S.* 224, 90 *S.Ct.* 1963, 26 *L.Ed.*2d 578 (1970); *State v. Lueder*, 74 *N.J.* 62 (1977), do not persuade this court it should defeat Philadelphia's effort to secure its taxes by the kind of collateral proceedings taken here.

Finally, the court has considered a case which bears some analogy to the present situation: *State v. Pitner*, 80 *N.J.Super.* 91, 193 *A.2d* 143 (App.Div.1963), rev'd 42 *N.J.* 251, 200 *A.2d* 104 (1964). There the Municipal Court of Philadelphia found a defendant, indicted for violating the Pennsylvania fornication and bastardy statute, not guilty when it approved a release signed by the child's mother acknowledging her receipt of $1,000 from defendant. The release absolved defendant from "all manner of criminal and civil . . . actions . . . for . . . the birth, maintenance, support, education and bringing up of said child . . . ." When the mother sought a declaration of paternity and support in New Jersey, the Supreme Court found the proceedings in Pennsylvania entitled to full, faith and credit in New Jersey despite their origin in the criminal process and dismissed the action. This result, while it flows from treating the Pennsylvania proceedings, in effect, as "*quasi* civil" and thus not within the penal law doctrine, is significant as a benchmark in the rise of full, faith and credit as the more dominating policy consideration and has thus influenced this court.

Accordingly, based on the lack of an unequivocal appellate court decision denying full, faith and credit to a money judgment based on a penal law, the weakness of the underlying rationale for the penal law rule outside the criminal law context, and the modern vitality of the policy of full, faith and credit, the court holds this Pennsylvania judgment entitled to enforcement in New Jersey. Judgment will be entered for plaintiff together with costs of suit to be taxed.